# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 287 | **DATE** | 7/13/2004 |
| **CASE TITLE** | UNITED STATES vs. PAUL VAN EYL | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ ___.

(3) ☐ Answer brief to motion due ___ ___. Reply to answer brief due ___ ___.

(4) ☐ Ruling/Hearing on _____ set for ___ ___ at ___ ___.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ___ ___ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at ___ ___.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ ___ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter memorandum opinion and order denying request for judgment of acquittal, but granting, in the alternative, a new trial.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | JUL 15 2004 | |
| | Notices mailed by judge's staff. | number of notices | |
| | Notified counsel by telephone. | date docketed | 58 |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | 2004 JUL 15 PM 5:26 | docketing deputy initials |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | |
| DW | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 02 CR 287 |
| | Judge James B. Zagel |
| PAUL VAN EYL. | |

## MEMORANDUM OPINION AND ORDER

This fraud trial began with twelve counts, all but two of which ended in a hung jury. Defendant Paul Van Eyl was convicted of wire fraud and false statements to the SEC. The mistried counts included substantive counts of securities fraud, bank fraud and false statements to a financial institution. Van Eyl now moves for a judgment of acquittal, and, alternatively, for a new trial.

DOCKETED
JUL 16 2004

## Motion for Judgment of Acquittal

That there was a criminal fraud is not in dispute. A company called First Merchants Acceptance Company ("FMAC") conducted business in the subprime loan market. FMAC was publicly listed. It had a loan portfolio on which it collected payments. A good deal of its business performance was judged on its ability to collect on the loans. The President of FMAC, Mitchell Kahn, a co-defendant in this case plead guilty and testified to various ways the company used to make its books look better than they should have. The idea was to manipulate the delinquency and charge-off rates on its loan portfolio during a certain period of time. Fewer delinquencies and fewer writing off of loans make a loan portfolio look better.

No single technique was used. Where an auto loan had failed and the vehicle was repossessed, the loan was kept on the books at its full value instead of the lesser value that proper



accounting and FMAC's own procedures required. When a borrower disappeared and could not be found, the loan was not written off completely as it should have been, but was discounted by only 45% of its value. The accounts of those who were delinquent but whose property had not been repossessed and who had not "skipped" into the land of unfound, should also have been discounted but were not. The technique here was to give deferments to such borrowers. Deferments are legitimate devices used by lenders who believe that a borrower has fallen behind in payments because of some temporary hardship. To give the borrower a chance to set things right, the borrower is offered a deferment. Usually a deferment is given only after obtaining the signed deferral from the borrower who pays a deferment fee. FMAC policy (which, I infer, was common in the business) was that deferments were not offered to persons who were more than one or two payments behind. Contrary to this policy, however, deferments at FMAC were given to many who did not sign agreements (and may not have even been informed of them) and who were too delinquent to qualify for them. The end result of granting these deferrals was that delinquent accounts were converted into current accounts. None of these things should have been done although many of them were remedied before SEC reporting periods and the deferrals were disclosed.

Although Van Eyl really had little to do with the required bank and government filings at issue here,[1] a reasonable jury could find that he knowingly participated with Kahn in a scheme to cook the books of FMAC to keep the stock price of FMAC shares high. Van Eyl was a high-ranking employee of FMAC, in essence Kahn's right hand man. A jury could find beyond a reasonable doubt that a small number of FMAC employees under the leadership of Kahn and the

---

[1] I suspect that this is why the jury hung on some of the counts.

supervision of Van Eyl invoked practices which produced misleading numbers and then gave these numbers to various unsuspecting employees and outside professionals who used them to comply with the company's various obligations to report to banks, the SEC and others. Therefore, I deny the motion for judgment of acquittal.

Motion for New Trial

The vexing problem of this case is the motion for a new trial. I have taken an exceptionally long period of time to deal with this matter, partly because, until recently, I had some small expectation that a plea agreement could be reached, partly because I needed to examine portions of the trial transcript, the preparation of which was delayed, and partly because the question of a new trial is a close one.

Van Eyl never disputed the facts about what was done at FMAC. His defense was that he was "a 28 year old kid" without legal or accounting training who followed the lead of Kahn, a lawyer, and that financial officers in the company and outside auditors went along with the accounting. Van Eyl's defense was, in short, that his intent to defraud had not been proven. The defense was not "believe me, I did not know"; it was "the prosecution did not prove I knew." He presented no affirmative evidence that he lacked intent or knowledge that the accounting practices were fraudulent, and he never testified or offered any affirmative evidence that he had no intent to defraud. Although the fact that he did not testify cannot result in any inference of guilt, *Griffin v. California*, 380 U.S. 609 (1965),[2] Van Eyl's method of defense has to be weighed

---

[2] The rule has been somewhat criticized. *See, e.g.*, Albert Alschuler, *A Peculiar Privilege in Historical Perspective: The Right to Remain Silent*, 94 Mich. L. Rev. 2625, 2667-72 (1996) (reviewing objections to affording suspects and defendants a broad right to silence and arguing

3

for what it is against the prosecution's case in chief in deciding whether the basis for this motion for a new trial – the prosecutor's alleged improper rebuttal argument – was a significant error.

In general, the prosecutor's argument was effective. He refuted the suggestion that Van Eyl did not know his conduct was wrong by pointing out that other FMAC employees with whom Van Eyl regularly dealt knew it was wrong. For example, the prosecutor pointed out that Steve Zemaitis sought to transfer to another job at FMAC because "he could recognize right from wrong." The prosecutor further pointed out that Rich Zielinski, Brian Hake, and Norm Smagley all could tell that FMAC's reported delinquency and charge-off rates were fraudulent. Moreover, he noted that the Audit Committee of the Board ordered an investigation into the delinquency and charge-off rates because it too thought there was fraud. Finally, he noted that the Board itself eventually fired Van Eyl because of the fraud. In short, the prosecutor argued that if everyone else could see a fraud, then Van Eyl saw it too.

The problem with the evidence elicited by the prosecutors in their case in chief is that not one of these FMAC employees ever told Van Eyl that the manipulation of the delinquency and charge-off rates was a fraud. This issue was raised before trial, and I precluded the prosecution from introducing the opinions of these witnesses that something was very wrong at FMAC. I

---

that the privilege against self-incrimination was not intended to afford defendants a right to remain silent or to refuse to respond to incriminating questions). Moreover, a comparable such rule no longer exists in England, which has adopted a rule permitting courts to draw negative inferences from a defendant's refusal to testify without good cause. *See* Criminal Justice and Public Order Act, 1994, c. 33-35 (Eng.). While there may be some justification for the rule when it involves silence in the course of custodial interrogation by police – even if there were not Miranda warnings – it is difficult to defend when, as here, the defendant elects not to take the witness stand when he has heard all the evidence against him, is represented by counsel who can prepare him to testify and cannot be impeached by prior criminal convictions. Nevertheless it is the law and is binding upon me.

limited the use of their opinions only to those situations in which the opinions were essential to explain the actions taken by the witnesses and for only that limited purpose.

When the prosecutor violated that in limine ruling during closing argument, I overruled the objection. While the objection was not as full as it should have been, not as sufficient as it could have been, and perhaps deficient in giving me all the information I needed, I am reluctant to find waiver because I did understand the objection to refer to the form of argument that was being made. I overruled it, I recall, because I thought the door had been opened by the defense argument and, more importantly, because I thought the focus of the argument would be on the testimony of Peter Gorman.

After further consideration, however, I think the door had not been opened. Substantially, the focus of the defense argument was not that others thought everything was all right; rather the focus was that Van Eyl was not *told it was wrong*. The prosecution was not forced to make the argument it did in rebuttal. There was ample evidence that no single person other than Van Eyl, Kahn and perhaps Thomas Ehmann (the CFO) knew all the details of the different ways in which the numbers were being manipulated. Procedurally, the prosecution did not seek a ruling from me that the defense argument had waived its right to rely on the in limine ruling.

The truth is that the witnesses believed the accounting was wrong, or contrary to FMAC policy. The prosecution notes this very point – that these witnesses usually used words like "right," "wrong," "true," "false," and "fraud." It argues that these witnesses were not offering legal opinions. This is not a bad theory. It mutes the force of Van Eyl's argument that he was prejudiced with opinions not admitted under Rule 701. But my ruling was to exclude the moral as well as the legal opinions of the witnesses, which is acceptable to do. *See United States v.*

5

*Pollard*, 959 F.2d 1011, 1037 (D.C. Cir. 1992) (equating moral opinions with legal opinions); *Washington v. United States*, 390 F.2d 444, 455 n. 31 (D.C. Cir. 1967) (same).

The prosecutor should not have made this argument. It was powerful and persuasive, and it is impossible for me to conclude that it, standing alone, did not affect the verdict. But perhaps it did not stand alone. Peter Gorman did testify that he thought the practices were illegal and that he confronted Van Eyl with his opinions. This evidence showed that someone, who was subject to cross-examination, did tell Van Eyl that the practices were illegal. If this evidence is strong enough, then it may be that the argument about what Zielinski and others thought is not all that significant and indeed harmless error.

Peter Gorman was, at least at the time he testified, a very experienced manager of collections. At FMAC he was vice-president of collections and reported to Kahn. He thoroughly understood FMAC's policy governing charge-off of loans. In fact, he wrote the policy on deferments which included the requirement of a signed deferral agreement. Gorman oversaw collections but he did not oversee charge-offs nor did he have the power to charge off or defer an account. Van Eyl oversaw that.

In early September, Gorman was present at a meeting to discuss a new deferment program which Van Eyl presented. Immediately after the conference, he went to Van Eyl's office. At trial, he testified as to what happened there:

> Q. What did you say to him?
> A. I told Paul I felt uncomfortable. I felt it was, you know, didn't make sense to me. I didn't feel comfortable with it. You know, Paul responded that it was a common practice within the industry.
> Q. Did you respond?
> A. Yes. I felt that that was not true. I said, Paul, I said, I don't believe that is true. I think we are updating accounts and this is definitely wrong, and I think that

6

> somebody is going to have some issues at the Securities and Exchange
> Commission, is going to have issues with this and in my mind somebody is going
> to go to jail for this.
>
> Q. You said those things to Paul Van Eyl?
> A. Yes, I did.
> Q. What did he do?
> A. He looked at me and, I believe, mentioned that I wasn't a team player and then left
> his office and walked down the hall to Mitch Kahn's office and they closed the
> door.

Standing alone, this is quite damning testimony on the question of Van Eyl's conduct with respect to the deferment program. The fact that Van Eyl ended the confrontation by walking out of his office to see Kahn matters as well since Kahn testified that he and Van Eyl were co-conspirators in the fraud.

Gorman did not resign, however. He did not work on nor did he hear of the mass of deferrals that were made in the last months of 1996. He continued to work in collections along with another man who, in October, was assigned to "split" Gorman's job with Gorman. In December, Gorman resigned in a meeting with Kahn, but Kahn persuaded him to stay on and go to Nashville, Tennessee where FMAC had a collections center. Gorman was there until mid-March when he returned to corporate offices. On April 1, he was let go and told his job had been eliminated.

Gorman was impeached by omissions from the FBI report of his interview, which Gorman conceded was an accurate report. The cross-examination went this way:

> Q. Is that an accurate summarization of what you told the FBI in November of 1997,
> as best you can recall?
> A. Yes, I believe it was.
> Q. And nowhere in that report does it say that you told the FBI that in November of
> '97 that Paul Van Eyl went down to Mitch Kahn's office after that meeting,
> correct?
> A. I can't remember. I mean –

7

Q. No, the question is, the report doesn't reflect your saying that, correct?
A. Correct.
Q. Now, I was taking down notes – during this conversation I heard you on direct say that Paul Van Eyl said two things to you. One, deferrals are common practice in the industry, is that your testimony?
A. Yes.
Q. And, two, you claim he said "I wasn't a team player," right?
A. Yes.
Q. Go back to that FBI 302 report. Go back to that report of your interview, sir.
A. Okay.

\* \* \*

Q. You never told the FBI, in November of '97, that Paul Van Eyl said, "You are not a team player," right?
A. To be honest with you, I can't remember whether I did or didn't.
Q. Okay, but you said you have reviewed this report and it is an accurate summation, correct?
A. I believe it is an accurate summation.
Q. And, according to the report, you didn't say that, did you?
A. If it doesn't show in there.

\* \* \*

Q. Mr. Gorman, would you turn to page four?
A. Yes.
Q. In that paragraph, sir, did you, according to this report, did you tell the FBI that after the meeting adjourned Gorman told Van Eyl that he was uncomfortable with the program. Gorman told Van Eyl that this program was clearly a violation of securities laws and that the Securities and Exchange Commission may someday investigate this matter, correct?
A. Yes.
Q. And Gorman specifically told Van Eyl that in Gorman's opinion someone is going to go to jail for this, right?
A. Yes.
Q. Now, did you then also tell the FBI that Gorman remembered that Van Eyl turned pale upon this accusation?
A. Yes.
Q. And, sir, did you tell the FBI that he said – he told Gorman that these accounting procedures are perfectly acceptable – isn't that what you told the FBI he said?
A. Yes.
Q. And then you responded – you responded, that's bullshit and you know it. That is what you said in November, right?

8

| | |
|---|---|
| A. | Yes. |
| Q. | Now, sir, when you testified today you didn't tell the jury that Paul Van Eyl told you that these accounting procedures are perfectly acceptable, did you – did you? |
| A. | I believe I mentioned that he felt that they were acceptable. |
| Q. | You were talking about deferrals there, sir. Here is my question. Did Paul Van Eyl tell you on this day when you raised your concerns that in his mind these accounting procedures were perfectly acceptable? Did he tell you that, sir? |
| A. | Yes, he did. |

There was other cross-examination which established that Gorman did not relate any of his concerns to other FMAC officers, the general counsel, the outside auditors or the Board of Directors all of whom were easily accessible to Gorman on one or more occasions. Gorman also admitted that he did not possess expertise in securities law.

The re-direct focused on the fact that Gorman did tell Kahn of the problems. As he testified, "I told him I felt that the way the company was being run and things he did [referring to the deferral program], I didn't feel comfortable with and wanted to leave the company."

Re-cross was short:

| | |
|---|---|
| Q. | Let me see if I got this right. So now it is December, three months – four months later you go to Mitch Kahn and you say, you know what, everything is improper around here, right? |
| A. | No, I just resigned because I didn't feel comfortable being with that company. |
| Q. | So then he says, why don't you take this demotion and go down to Nashville? |
| A. | He asked me to stay. He said, Peter, give me some time to get this thing fixed up and would you please go down to Nashville, and I said, yes, Mitch, I will. |
| Q. | And you said, okay, great, thanks? |
| A. | I did. I said, yeah, I will. |

Most of Gorman's testimony is phrased in terms of being "uncomfortable" with what was happening. This feeling could encompass everything from criminal misconduct to management style to choice of office furniture and all the policy and practices in between. It is simply not

9

clear what Gorman meant. That he thought the company was badly run on a number of fronts is clear from his testimony, and it is clear that he was right.

One could reasonably interpret Gorman's statement as a clear warning that the deferral policy was criminal. But one could just as reasonably interpret it in other ways. He did not resign from an enterprise which he thought was criminal until months later and then was easily talked out of it by a man whom he believed to be in on the misconduct. This allows an inference that he thought it was mismanagement and not crime that was at hand. Moreover, he was in profound disagreement with Van Eyl's program which was in violation of the policy he had authored. In corporate turf battles, it is not uncommon to allege that your opponent's program would be illegal. The accusation has more force than simply saying something is foolish, short-sighted or bad business – much like legislators who say a bill is "unconstitutional" as a substitute for simply saying that they don't agree with the proposal. Finally, Gorman never used words like "Securities and Exchange Commission" or "jail" again, perhaps because, as a non-expert, he was not so sure of his ground in the face of Van Eyl's assertion that the practice was legitimate.

One could legitimately argue that there is not a scrap of evidence that Van Eyl ever, after his conversation with Gorman, brought the issues to the attention of the general counsel, the outside auditors, the board of directors or any other person not involved in the decision to go ahead with the practice. This is a fair comment on the evidence and not a comment on the defendant's silence. It is a decent argument but, even if voiced, it does not overwhelm the defense or cancel out the improper prejudice that arose from the earlier argument that violated my ruling in limine. Therefore, I grant the motion for a new trial.[3]

---

[3] My ruling should not be interpreted as a judgment that the prosecutor violated any reasonable standards of professional ethics. The prosecutor was mistaken about his right to make

For the reasons above, Van Eyl's Motion for Judgment of Acquittal is DENIED, but his Motion for New Trial is GRANTED.

ENTER:

*James B. Zagel*
United States District Judge

DATE: JUL 1 3 2004

---

the argument he did and mistaken to believe that the defense had opened the door to an otherwise prohibited argument. These are honest mistakes made in good faith by a lawyer who has in his appearances before me demonstrated a high standard of professional ethics and a sense of fairness toward opposing parties.